## GOULD *v.* SENEY *et al.*

*(Supreme Court, Special Term, New York County.* May, 1889.)

1. EQUITY—ACCOUNTING—WHEN ORDERED.

Defendants, a committee appointed to receive and disburse subscriptions for the purpose of effecting a consolidation of certain railroad companies, and extending the lines, may be required to account to the subscribers for the amount so received, and it is immaterial whether or not they were originally trustees or were legally appointed.

2. CORPORATIONS—CONSOLIDATION—"BLIND POOLS."

A consolidation of three railroad companies was proposed, the necessary funds to be raised by subscription of the stockholders of the several companies. It was doubtful whether one of the companies (the R. & A.) could obtain legislative consent to enter the combination, but it was arranged that the other two should combine at all events; and the subscribers were aware of this. The first call under the subscription stated that it was for the extension of one of the two roads whose consolidation was definitely arranged for, and for "other purposes." Afterwards, the entire fund was paid in. A committee was appointed, after the first installment was paid, to receive and disburse the fund. After this, the consolidation agreement was filed. *Held,* that an advance by the committee to the R. & A. Company for the purpose of effecting the consolidation was authorized, through the legislature refused to assent to its entering the combination.

Action by David H. Gould against George I. Seney and others.

*O. P. Buel,* for plaintiff.   *Simpson, Thacher & Barnum, (Ashbel Green,* of counsel,) for defendants.

O'BRIEN, J.   This action is brought by the plaintiff, one of the contributors to a fund of $5,000,000 for constructing a railroad, for an accounting, against the defendants Seney and Schethar, to whom the fund was intrusted, and who were to obtain for the subscribers securities for the moneys paid in on their subscriptions. The committee are charged with diverting a large part of the fund to purposes wholly foreign to those for which it was subscribed, and with breach of trust in failing to obtain for the subscribers adequate securities representing the moneys so diverted, and with a further breach of trust in causing or permitting through their fraud or negligence the securities actually obtained, and representing the moneys for a portion of the road, to be debased or impaired in value. From the pleadings and the evidence the facts necessary and essential to determine the rights of the parties are reasonably free from doubt or dispute. In July, 1881, there were three railroad corporations, the Ohio Central, the Atlantic & Northwestern, and the Richmond & Alleghany. The Ohio Central consisted of what was known as its "Main Line," from Toledo to Coming, with a branch from Hodley Junction to within four miles of Columbus, and also of a projected line from Coming south to the Ohio river. No part of the Atlantic & Northwestern had been built. Its projected line was through the state of West Virginia from Point Pleasant, on the Ohio river, up the Kanawha river to Charleston, and on up to the falls of the Kanawha or the mouth of the Gauley. The Richmond & Alleghany was then only partially completed, its line under construction being from Richmond to Clifton Forge, with a branch from Balcony Falls. At Lexington the rails were for the most part laid. The road from Clifton Forge to Richmond was opened in October, 1881. It was about two-thirds or three-fourths completed in June, 1881. The subject of consolidating these three into one, and of building two intervening links, which were respectively described as the "Central Division" and the "River Division," so as to have a trunk line from Toledo, Ohio, to Richmond, Virginia, or, as otherwise described, from the "lakes to the sea," having presented itself, an informal meeting of some of the directors of the several roads was had some three months before the 1st of July, 1881. Considerable talk and discussion seems to have taken place at this meeting; and, though no action binding upon the respective corporations was taken, it was informally agreed that the sum of

$5,000,000 should be raised and applied towards the completion of the trunk line.    At that meeting the amount of money needed, and the way it was to be spent, was thus outlined on the back of a note or telegram: "$5,000,000, cash."    Beside this: "Four million dollars first mortgage bonds, four millions income bonds, and five millions stock."    Below: "For Ohio Central, $500,000; for Richmond & Alleghany, $1,250,000; for construction, $3,000,-000; for Atlantic & Northwestern Railroad Company, $250,000."    The general scheme as thus outlined appears to have been agreed to by all the gentlemen present, the presidents of the three companies who were present assenting thereto.  · By the middle of June, formal meetings had been held by the railroad companies, taking action looking to the consolidation; and on July 1, 1881, an agreement of consolidation was made between the three companies. On June 27, 1881, there appeared in the Daily Graphic a map with an accompanying description showing the road from Toledo to Richmond, as proposed through the consolidation of these companies, which the plaintiff admits to have seen.    The plaintiff thereafter, and at about the time it bears date, received a notice, which was also published, as follows: "Ohio Central Railroad, New York, July 1, 1881.    To the Stockholders of the Ohio Central Railroad Company:   Notice is hereby given that subscriptions for $5,000,000 for the construction of River Division from Coming, Ohio, Central Division of Chesapeake & Ohio Railroad crossing and Ohio river bridge, and other purposes, have been allotted as follows:   The stockholders of the Ohio Central Railroad, $2,400,000; to holders of certificates of Richmond & Alleghany, $2,000,000; to stockholders of Atlantic & Northwestern, $600,000.   Subscription certificates will be issued entitling subscribers to *pro rata* shares of such securities as may be issued by subsequent agreement of the committee and railroad company; also, to right of *pro rata* share of subscription of Central Division, when offered.    The right to subscribe will expire July 1, 1881, as balance of subscription not then taken has been placed.   By order of P. G. MITCHELL, Secretary."   A notice substantially similar, save that it was signed "F. O. FRENCH, for Committee," was also issued and published to the stockholders and holders of the stock and trust certificates of the Richmond & Alleghany. At the time, F. O. French was president of the Richmond & Alleghany.    The plaintiff, having stock in both the Ohio Central and the Richmond & Alleghany, received both notices, and thereafter subscribed, and upon the payment of the first installment received a receipt in form as follows:   "Received from ————, on account of subscriptions in ———— Railroad, upon circular, July 1, 1881, formal receipt of Metropolitan National Bank to be given on receipt thereof." Thereafter, plaintiff received from the Metropolitan Bank, through his bankers, the formal receipt as follows:   "This certificate must be presented when installments are paid.   Richmond, Alleghany & Ohio Central Railroad certificate. This certifies that ———— subscribes to the fund for the purchase, construction, and equipment of the Richmond, Alleghany & Ohio Central Railroad Company to the amount of ————, and is entitled to participate in the distribution of stock and bonds, in accordance with the terms and conditions of the subscription.   *  *  *   In witness whereof, etc.   *  *  *"   For the installments after the first, calls were issued and published to the plaintiff and the other subscribers in form as follows:   "Richmond, Alleghany & Ohio Central Railroad Company, River Division.   New York, August —, 1881.   An installment of 10 per cent. on your subscription for the construction and equipment of this company, etc.   *  *  *"   At the time that original notices to the stockholders were issued and published no committee had been agreed upon, but later in the summer, and after the payment of first installment, the defendants Schethar and Seney were selected to superintend the work of receiving the money, paying over the same, and delivering the securities to the subscribers to the fund.   It is conceded that these original notices were neither drawn, issued, nor published by Seney nor Schethar, although they came into

possession, not only of the moneys which prior to their appointment were paid in, but also of the entire fund subscribed, before any contract was made respecting the fund. The consolidated company had no existence in law or fact until January 27, 1882, when the agreement for consolidation was filed. The consolidation, when made, did not include the Richmond & Alleghany Railroad Company, which, under the consolidation agreement, was not to be included unless the sanction of the legislature of the state of Virginia permitting said road to consolidate could be first had and obtained. It was this uncertainty as to the Richmond & Alleghany ultimately coming into the consolidation which prevented the formation of the consolidated company in the beginning. For it was agreed between the companies that, if the legislature of Virginia would permit the Richmond & Alleghany to come in, the name of the consolidated company should be "The Richmond, Alleghany & Ohio Central Railroad Company;" and, in the event of such permission being refused, that the other two companies should consolidate under the name of "The Ohio Central Railroad Company." It will be noticed, then, in passing that the name "Richmond, Alleghany & Ohio Central Railroad Company," which appears at the head in the formal receipt or certificate given by the Metropolitan Bank, never belonged to any existing company, but was used and must be construed as designating the consolidated company to be formed, which, in a certain event, as stated, would take the name "Richmond, Alleghany & Ohio Central Railroad Company;" or in a certain other event, to-wit, in case the Richmond & Alleghany should not come in, the name "Ohio Central Railroad Company." Of the $5,000,000 thus subscribed, by direction of the defendants Seney and Schethar, $1,250,000 was loaned or advanced to the Richmond & Alleghany Company, which has since become insolvent. Five hundred thousand dollars out of this fund was paid to the Ohio Central Railroad Company, since become insolvent, and about $150,000 seems to have been applied on coupon account. Excepting as to these amounts, it is not claimed but that all of said fund was applied to the purposes of the subscription; and it is with respect to these sums that the plaintiff claims there has been a diversion and breach of trust, entitling him to have an accounting from the defendants. In addition to the disposition of this question, he, plaintiff, also asks that the other defendants, the Metropolitan National Bank and the Ohio Central Railroad, should account for the $2,000,000 of the mortgage bonds of the Richmond & Alleghany Railroad Company which were given to Seney and Schethar as collateral security or to guaranty the return of the $1,250,000 advanced or loaned to said company, and which mortgage bonds or securities were subsequently transferred by Seney and Schethar to the Ohio Central Railroad Company, and by said Ohio Central delivered to the Metropolitan Bank as collateral security for the loan of $500,000 made by said bank to said railroad.

In discussing, therefore, the rights of the plaintiff as a subscriber to this fund against all the defendants, the questions affecting the defendants Seney and Schethar and those affecting the Ohio Central Railroad and the Metropolitan Bank, being different, should be disposed of separately. First, as against the defendants Seney and Schethar, there can be no doubt as to the theory of the action. Its scope, so far as they are concerned, is shown by the first paragraph of the prayer, which asks that they "be declared to be trustees of said fund of $5,000,000 for constructing and equipping the said 'River Division,' for this plaintiff and all other holders of said certificates, * * * and account for all moneys received." The defendants, at the outset, meet the issue presented by claiming that they were not trustees of said fund for the subscribers, claiming (a) that no trust attached to said fund; and, (b) if the fund was charged with a trust, these defendants were not trustees thereof. I deem it unnecessary to follow the learned counsel for the defendants in their argument in support of these contentions, being impressed more firmly now than

I was upon the trial that the relation existing between the defendants Seney and Schethar and the subscribers was such as to entitle the latter to demand an account of the moneys subscribed, and which were placed in their hands for distribution; therefore, were this a simple action for an accounting against these defendants, the *status* of the plaintiff as an original subscriber being admitted, all that it would be necessary for plaintiff to show to entitle him to an interlocutory decree for an accounting would be that these defendants were accounting parties.    To compel parties to account, it is not necessary to show that they were originally trustees, or that they were regularly or legally appointed, it being enough to show that, as a syndicate committee or as the agents for the subscribers, they undertook the disbursement of the fund which came into their hands, and thus contracted towards the persons subscribing such a relation as would make them accounting parties.

While, therefore, my conclusion is that the plaintiff has the right to maintain this action, upon the facts proved, for an accounting, this should not involve any protracted reference, for the reason that no question is raised as to $3,000,000 alleged to have been expended on the "River Division," and it being conceded that the $1,250,000 was advanced to the Richmond & Alleghany Railroad Company, $500,000 to the Ohio Central Railroad Company, and $150,-000 for coupon accounts, it remains, therefore, to determine upon such accounting whether the disbursing of these last-named sums in the manner specified was a diversion of the fund from its original purpose, or whether these payments were made in accordance with and in pursuance of the plan under which said fund was originally created.    Practically, then, the case stands as though an accounting was being had; and, after a showing as to how those payments were made, the plaintiff objects to their allowance, thus raising the questions in the same manner as now presented, as to whether or not the defendants are entitled to credit for those payments, as having been made in accordance with and in pursuance of the terms of subscription, and in compliance with their duty as custodians of the fund.    If these questions can be disposed of by the court, it will be thus seen that no reference is necessary; for, if finally decided that these payments were a diversion from the purposes of the plan or scheme pursuant to which the fund was created, then the defendants would be liable to plaintiff for his proportion of such sums, and should account to him therefor.    If, on the other hand, it should be decided that they had the right to advance the moneys, there being no question as to the moneys having been advanced or paid out as claimed, these defendants will be entitled to a credit for such payments.    The substantial question then is:  Did the defendants Seney and Schethar, in making these payments, divert a part of the fund to purposes wholly foreign to those for which the money was subscribed?  It is evident that the solution of this question necessarily depends upon the conclusion to be reached as to which is the right one to take of two diverse, distinct, and conflicting views.    On one hand it is contended that any moneys used other than in the construction exclusively of the River Division or bridge over the Ohio river, or for the appurtenances or equipment of the same, was a diversion.    On the other hand it is claimed that any payment made for the purpose of carrying out the original scheme of consolidation, and expended in the attempt to construct a continuous line from Toledo to Richmond, was within the purposes for which the fund was raised, and cannot be considered as a diversion.    In disposing of these contentions it is necessary that all the surrounding facts known to the subscribers should be used to throw light on the transaction.    They were invited to participate in the benefits of a supposed great enterprise,—a new trunk line from the lakes to the sea.    They were aware, from the consolidation agreement which had been communicated to the stockholders here of all the three companies, that the Richmond & Alleghany was not to form a part of the consolidated road unless and until the legislature of Virginia should approve of the measure.    In support of plain-

tiff's theory, therefore, it is claimed that there being this uncertainty as to the Richmond & Alleghany ultimately coming into the consolidation, the first call for the construction was limited to that portion of the line which would in any event be embraced in the consolidation, to-wit, the River Division, thus leaving the subscription to a fund for the Central Division (from the Chesapeake & Ohio crossing to Clifton Forge) for future consideration. Not only is the fact that the Central Division was to be left for future consideration a strong argument for plaintiff's contention, but it is further strengthened by a statement in the first call, to-wit, that it was to be "for the construction of the River Division from Coming, Ohio, to Central Division at Chesapeake & Ohio Railroad crossing, Ohio bridge, and other purposes." If, therefore, it were to be assumed that the original call issued and published must be construed into the sole binding contract or agreement upon which the rights of the parties should be determined, I should be inclined to adopt this construction claimed by plaintiffs, for, as it referred to the River Division and bridge and other purposes, these latter should be so construed as including matters incident to the main subjects, viz., the building of the River Division and the bridge. In other words, if the subscription was solely for the purpose of constructing the River Division, and the terms of the subscription so confined it, we would be necessarily obliged, under well-settled rules of construction, to limit the application of the words "other purposes" to those incident and appertaining to the River Division itself. But the original call, being one of several papers issued from time to time, is not to be held to be the sole and binding contract; but the published statements, the formal receipts, the participation of three companies in the subscription, and all the calls, are to be read together in the light of the other facts and circumstances known to the subscribers, in order to determine the terms and purposes of the subscription. When the plaintiff paid in his money he got a certificate which stated that he subscribed to a fund for the purchase, construction, and equipment of the Alleghany, Ohio & Central Railroad Company. It is conceded that this was to be the company that was to control the continuous lines from Toledo to Richmond, and into this company under the scheme of consolidation the roads built and to be built were to be merged. If the original call were to be disregarded, and this receipt or certificate was to control, there can be but little doubt that, in the light of the surrounding circumstances, and under powers as broad as were vested in the committee, the latter would be authorized to dispose of the fund for the building or completion of any portion of the railroad between Toledo and Richmond. Giving full force, however, to the original call, I cannot divest my mind of the conclusion irresistibly forced upon it that the subscribers, including the plaintiff, were aware of the general scheme and plan, which was not only to build the River Division, but likewise to construct and equip the other roads which were to become a constituent part of the consolidated road. Nor do I think it was intended to limit the expenditures of the moneys subscribed to the fund to the exclusive construction of the River Division; for, although the construction of the Central Division was to be a matter of future consideration, from what source, except the $5,000,000 fund, was the money to come from to complete the Richmond & Alleghany, not yet completed; the Atlantic & Northwestern, not yet begun?— all as essential to the general scheme as the River Division itself, and in which such contributors to the fund as were stockholders of these respective corporations were equally as interested in having completed as the River Division itself. Although, therefore, it be conceded that the $5,000,000 would have been sufficient to fully complete the River Division, without the completion of the other roads, the scheme of a continuous line from the lakes to the sea would not have been effected. Aside, however, from this consideration, had it been agreed or understood that the securities the subscribers were to receive were to be secured on the River Division, then much force might be

given to the suggestion that the subscribers had the right to have the money
go in enhancing the value of property out of which their securities were to
come; but there was no such agreement or understanding.    The securities
they were to receive in return for their subscriptions were such as the com-
mittee could secure by agreement with the consolidated company.    Such se-
curities as they subsequently received the committee divided among the sub-
scribers.    The whole scheme was undoubtedly of a character aptly designated
as a "blind pool."    The plaintiff here accepted a privilege to contribute money
to be used in building a railroad, a bridge, and for other purposes, for which
he was entitled to receive such securities as an.unnamed committee should be
able, by agreement, to obtain from an unnamed company.    Thereafter the
subscription certificate describes the fund as being for the purchase, construc-
tion and equipment of the Richmond, Alleghany & Ohio Central Railroad.
Having advanced and expended the moneys in the effort to complete the roads
thereafter to form constituent parts of this consoli lated company; having there-
after turned over to the consolidated company all the assets in their hands,
taking from the company a million and a half of its stock for the benefit of the
subscribers and an agreement to complete the River Division,—I fail to see
upon what theory their liability to again pay these moneys can be predicated.
If the plaintiff entered into a scheme wherein his rights were not defined,
where the duties of the committee were not restricted, he has only himself to
blame.

The only questions that, in my opinion, could possibly arise, relate solely to
the $1,250,000 which was loaned or advanced to the Richmond & Alleghany,
and as to the title to the $2,000,000 bonds given back to the committee as col-
lateral security therefor.    Had it been expended, and had this company been
afterwards merged in the consolidated company, the same reasoning would
apply to this as to the payments made to the Ohio Central, and the moneys
expended on coupon account.    But since the Richmond & Alleghany did not
finally become a member of the consolidated company, and as some of the
money was given after it was ascertained that the legislature of Virginia
would not assent to this company becoming a part of the consolidated com-
pany, it is urged that a different rule applies.    It must be remembered, how-
ever, that the main object or end of the plan or scheme was not consolidation;
this latter being but the means by which the end in view—viz., the construc-
tion and equipment of the line from Toledo to Richmond—was to be effected.
This was the purpose, whether the three companies became legally one or re-
mained distinct corporations.    The uncertainty as to what course the Virginia
legislature would adopt led the committee to treat the advance made to the
Richmond & Alleghany in furtherance of the common design as a debt, se-
cured to be paid by $2,000,000 of its second mortgage bonds, and this debt,
and the bonds securing the same, were transferred to the treasury of the con-
solidated company, whose stock and bonds the subscribers received, and I
think it can be claimed that thus the value of their stock and bonds was en-
hanced, and as nearly as may be the same result attained as would have been
had consolidation been perfected.    It must be remembered, moreover, that a
large part of this fund was subscribed by those interested in the Richmond &
Alleghany; and, even if we disregard the apportionment of the money to this
company as originally made and assented to by the others at the informal
meeting as not binding, there is a fair presumption in favor of the expecta-
tion that part of the fund should be expended in completing this, as well as
enhancing the value of the other properties embraced in the enterprise.    As
to the $2,000,000 bonds received from the Richmond & Alleghany and turned
over to the consolidated company, and subsequently pledged to the Metropol-
itan Bank as security for the loan made by the latter of $500,000, I am of the
opinion that the plaintiff upon the facts has no such relation or rights against
the bank as would entitle him to recover them back in this action.    There was

no fraud, collusion, or conspiracy attending the transfer. The committee could have itself enforced the debt, and realized from the security funds to build the road. In obtaining the bonds and stock for the subscribers from the consolidated road the committee transferred the debt against the Richmond & Alleghany with these collateral bonds. If the committee had no such right, then it would be clear that the bank, its president and cashier having knowledge of the facts connected with the bonds, took with notice. I am of opinion, however, that the committee, in the absence of proof of fraud or bad faith, had a right to transfer this debt and collaterals to the consolidated company, in order to have the same used for the purposes for which the original fund was created, and to obtain the securities which the railroad and committee agreed should be issued and distributed. The consolidated company pledged these collaterals with the bank, and the money thus borrowed was expended in building bridges on the River Division. Upon the whole case, therefore, my conclusions are that the relations between the plaintiff as a subscriber and the committee are those of accounting parties, and that plaintiff is entitled to an interlocutory judgment for an accounting, which is to be governed by the views as to the items in dispute as herein expressed, and that the defendant the Metropolitan Bank, is entitled to judgment dismissing the complaint as to the $2,000,000 bonds of the Richmond.& Alleghany Company. Judgment accordingly.